IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TRINITY FELLOWSHIP CHURCH OF PAMPA,<br><br>Plaintiff,<br><br>v.<br><br>CHURCH MUTUAL INSURANCE COMPANY SI,<br><br>Defendant. | 2:25-CV-019-Z |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff Trinity Fellowship Church of Pampa's ("Trinity") Motion to Strike Expert Testimony ("Trinity's Motion to Exclude") (ECF No. 32), filed December 8, 2025, and Defendant Church Mutual Insurance Company, S.I.'s ("Church Mutual") Motion to Exclude Expert Opinions ("Church Mutual's Motion to Exclude") (ECF No. 37), also filed the same date. Also before the Court is Church Mutual's Motion for Partial Summary Judgment (ECF No. 34), filed December 8, 2025. The Motions are now ripe. Having reviewed the Motions, briefing, and relevant law, Trinity's Motion to Exclude is **DENIED**, Church Mutual's Motion to Exclude is **GRANTED**, and Church Mutual's Motion for Partial Summary Judgment is **GRANTED** in part and **DENIED** in part.

**BACKGROUND**

On June 12, 2023, a storm (the "June 2023 Storm") "allegedly caused hail damage to the roof and siding" of Trinity's church building in Pampa, Texas (the "Property").[1] ECF No. 35 at 6. Pastor Kris Humphrey reported the loss to Trinity's insurer, Church Mutual, on June

---

[1] The following facts are primarily from Church Mutual's Motion for Partial Summary Judgment. ECF No. 35 at 6–11. Trinity did not object to Church Mutual's characterization of this case's basic facts. *See generally* ECF No. 51 (attempting to create several factual disputes but declining to object to Church Mutual's recitation of the core facts underlying this dispute).

20, 2023. *Id.* Humphrey "further reported alleged leaks in the roof but stated that the damage was minor." *Id.* at 7.

Church Mutual "immediately began its investigation and retained independent adjuster Charles Bankston with Sedgwick to assist in the adjustment." ECF No. 35 at 7. "Bankston completed an initial inspection on July 5, 2023, and reported limited damage to the Property." *Id.* "Bankston reported that he observed no visible damage to" the Property's roofing system. *Id.* Bankston recommended that Church Mutual perform certain repairs to the Property, "for which he prepared an estimate in the amount of $9,085.39." *Id.*

This amount fell below Trinity's $168,660 deductible. *See* ECF No. 35 at 7. Church Mutual advised Trinity of this on July 26, 2023. *Id.* Trinity "disagreed with the scope of repairs and advised that it would submit an estimate from its contractor for alleged damage to the Property for Church Mutual's consideration." *Id.* Trinity did so about a month later, on September 5, 2023. *See id.* Trinity's contractor's estimate "total[ed] $1,339,163.97," which included "costs for full replacement of the [roofing system] on the Church, the shingle roof on the shed, metal awning and carport, sport court, fabric playground covers, and spot / painting repairs of the exterior EIFS elevations." *Id.* "Upon receipt of the estimate, Church Mutual re-assigned the claim to its large loss team and retained engineer Matthew Cowen with Scout Forensics LLC to further evaluate the claimed damage to the Property." *Id.* at 8. Church Mutual also retained another building consultant, Frank Jones of Cavalry Construction & Restoration, "to provide the reasonable costs of necessary repairs." *Id.*

"On October 5, 2023," now nearly four months after the date of loss, "Cowen and Jones inspected the Property with Pastor Humphrey and Chase Brewer of Texas Plains Contractors." ECF No. 35 at 8. At the inspection, "Brewer informed Cowen that there was moisture intrusion at multiple locations in the Church building, though he acknowledged

that at least one location was reported and repaired by Brewer prior to the reported date of loss." *Id.* Afterwards, Cowen reported the following two key findings: (1) "The exterior wall claddings, aggregate-surfaced [roofing system], modified bitumen membrane roofing, metal panel roofing, awnings, fabric canopies, and building accessories were not damaged by wind forces"; and (2) "[t]he aggregate-surfaced [roofing system] and three of the fabric canopies were not damaged by hail." *Id.* "Based on his overall observations, Cowen recommended a few repairs to the Property's roofing and cladding." *Id.*

Crucially for purposes of this litigation, "Cowen disagreed that the interior moisture damage was related to" the June 2023 Storm. ECF No. 35 at 8. He "instead report[ed] that it 'was consistent with historical and ongoing moisture intrusion due to long-term weathering of the roofing and/or deficiencies in the moisture mitigation systems and, as such, was not a result of wind- or hail-created breaches.'" *Id.*

"Based on Cowen's findings, Cavalry prepared an estimate for covered repairs to the [Property] detailed therein, which totaled $98,683.01"—about $90,000 more than Church Mutual initially believed to be covered, but still below Trinity's deductible. ECF No. 35 at 9. Cavalry "further estimated repairs for the other structures in the amount of $13,823.85." *Id.* Church Mutual informed Trinity of this determination on November 22, 2023. *Id.* "In that correspondence, Church Mutual further explained that its engineer did not identify any hail-caused damage to" the Property's roof. *Id.* Church Mutual also stated that "covered damage to other structures" near the main church building "exceeded the separately applicable $2,500 deductible and that payment would be forthcoming for the observed damage to the playground fabric awnings and to the unscheduled storage building." *Id.* Church Mutual then issued payment in the amount of $11,323.85 on December 6, 2023. *Id.*

"Church Mutual heard nothing further from Trinity Fellowship until March 13, 2024, when Trinity's attorneys at Dugas & Circelli PLLC sent Church Mutual a letter of representation and request for certain documentation." ECF No. 35 at 9. Church Mutual acknowledged receipt and provided the requested documents. *See id.* "In the same correspondence, Church Mutual further requested any documentation to support Trinity Fellowship's claimed damages for further review." *Id.* Church Mutual reached out twice in April and June 2024. *See id.* Trinity never responded. *Id.* at 10.

On September 6, 2024, Church Mutual received "a pre-suit notice and demand letter from" Trinity's attorneys. ECF No. 35 at 10. "The letter accused Church Mutual of performing an inadequate investigation into the damages claimed by Trinity Fellowship and making misrepresentations to Trinity Fellowship regarding the damages to the Property in violation of the Texas Insurance Code, Texas Deceptive Trade Practices Act, and the duty of good faith and fair dealing." *Id.* The letter also included a settlement demand of $18,793,593.60. *See id.* (noting that this amount included "actual damages totaling $6,262,900.20; treble damages totaling $12,525,800.40; and attorneys' fees at an hourly rate of $699/hour"). Trinity's damages "were based on a revised estimate issued by Chase Brewer of Texas Plains Contractors, dated September 5, 2024, which totaled $6,445,384.05." *Id.* This new estimate nearly quintupled Brewer's original estimate "despite a nearly identical scope of work." *Id.*

Trinity sued Church Mutual in Gray County, Texas state court on December 11, 2024. ECF No. 35 at 10. Trinity brings causes of action under: (1) breach of contract; (2) violations of the Texas Insurance Code; (3) violations of the Texas Deceptive Trade Practices Act; and (4) breach of the common-law duty of good faith and fair dealing. *See* ECF No. 16. Church Mutual timely removed to this Court. *See* ECF No. 35 at 10.

## LEGAL STANDARDS

### I. Motions to Exclude

Under Federal Rule of Evidence 702, a witness

> who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

To be admissible, expert testimony must meet all four subparts of Rule 702. "The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible." *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 852 (S.D. Tex. 2020) (quoting *Gamboa v. Centrifugal Casting Mach. Co.*, No. CV 14-1273, 2015 WL 9948807, at *2 (S.D. Tex. May 15, 2015)).

"A trial court must evaluate the foundation of an expert's testimony to ensure that 'the proffered evidence is both reliable and relevant.'" *Guzman*, 456 F. Supp. 3d at 852 (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007)); *see also VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-CV-764, 2023 WL 348963, at *11 (N.D. Tex. Jan. 20, 2023) ("The party offering the expert testimony must show that a qualified expert's testimony is relevant (that is, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the expert's reasoning or methodology properly can be applied to the facts in issue) and reliable (that is, the testimony is based on sufficient facts or data and is the product of reliable

principles and methods)." (citation modified)); *Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018) (Fitzwater, J.) ("The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999))). "An expert's opinion is considered reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Guzman*, 456 F. Supp. 3d at 852 (citation omitted). "Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Courts look to several factors to determine whether expert testimony is reliable, including:

> whether the expert's opinion was developed for purposes outside of litigation; whether there is an analytical link connecting the case facts with the expert's opinion; whether the expert "adequately accounted for obvious alternative explanations"; whether the expert used the same level of intellectual rigor that would be used in the field; and whether the expert's field of expertise is known to be reliable for the relevant type of opinion.

*Guzman*, 456 F. Supp. 3d at 852 (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion . . . ." *Id.* (quoting *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 725 (5th Cir. 2009)).

An expert witness must also prepare a report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them and the facts or data considered by the witness in forming them." FED. R. CIV. P. 26(a)(2)(B) (citation modified). This means expert witnesses "must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Klein v. Fed. Ins. Co.*, No. 7:03-CV-

102, 2014 WL 6885973, at *2 (N.D. Tex. Dec. 8, 2014) (citing FED. R. CIV. P. 26 advisory committee's note to 1993 amendments). "[T]he purpose of the reports is to avoid the disclosure of 'sketchy and vague' expert information, as was the practice under the former rule." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996) (quoting FED. R. CIV. P. 26 advisory committee's note to 1993 amendments).

**II. Motion for Summary Judgment**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law," and the dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Brown v. City of Hou., Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003))).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). While the moving party is not required to negate each element of the nonmoving party's case, it can meet its burden by demonstrating the "absence of facts

supporting the elements" of the nonmoving party's causes of action. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)).

## ANALYSIS

### I. Motions to Exclude

#### *A. Trinity's Motion to Exclude*

Plaintiff Trinity moves to exclude the testimony of both of Defendant Church Mutual's experts, Matthew Cowen and Troy White. *See* ECF No. 33 at 1. Trinity argues that both Cowen and White did not: "(1) properly exclude[] cause[s] of interior leaks, (2) did not use the applicable Policy language to determine the extent of damage, and, but for new lab samples completed by White (3) provide the exact same cumulative opinions." *Id.* at 1–2.

##### 1. Matthew Cowen

Church Mutual retained Matthew Cowen, of Scout Forensics, to "evaluate the alleged damage to the Property." ECF No. 44 at 2. "On October 5, 2023, Cowen inspected the Property with various personnel including: (1) Trinity Fellowship's Pastor Kris Humphrey; (2) Trinity Fellowship's contractor Chase Brewer; and (3) Church Mutual's building consultant Frank Jones, Jr. with Cavalry Construction." *Id.* Cowen "gathered information from Brewer regarding the condition of the Property and the locations of reported damage, and Humphrey regarding general Property information and repairs." *Id.* Cowen then "issued a comprehensive report dated October 19, 2023, outlining his findings, observations, and conclusions." *Id.*

As Church Mutual notes, Trinity's Motion to Exclude "does not take issue with either Cowen's or White's qualifications as experts." ECF No. 44 at 3. Trinity instead objects that "because Cowen and White did not parrot the exact language used in the Policy's 'Limitations on Coverage for Roof Surfacing' endorsement in their reports, their opinions are therefore

irrelevant, unhelpful, and/or prejudicial." *Id.* (citation modified). And as Church Mutual further notes, whether Cowen or White cited this endorsement is irrelevant "because Church Mutual did not deny any portion of the claim based upon the Roof Surfacing Endorsement." *Id.* Quite the opposite: Church Mutual expressly "concluded that [damage to the roof] was not subject to the exclusion" and "include[d] damage to the metal roofing at the Property" in its assessment. *Id.* Trinity's Reply merely repeats the same arguments, in some places almost verbatim, without acknowledging that Church Mutual did not rely on the endorsement in issuing its claim decision. *Compare* ECF No. 33 at 7 ("Cowen and White's testimony is not based on the Policy and cannot aid the trier of fact in determining what is covered damages."), *with* ECF No. 58 at 2 ("Cowen and White's testimony is not based on the Policy and cannot aid the trier of fact in determining what damages to the roof are more than cosmetic."). By itself, this is insufficient to entirely exclude the testimony of two experts, as Trinity asks the Court to do.

Trinity next argues that "Cowen's opinions related to the cause of interior leaks are conclusory as they provide no analysis for determining the actual cause of the interior leaks and merely opine that 'moisture intrusion was attributable to other causes.'" ECF No. 33 at 12. Trinity asks the Court to exclude his expert testimony on that basis.

Trinity's argument *inverts* the parties' respective burdens: Trinity is not entitled to relief simply because Church Mutual's experts could not *disprove* the hailstorm thesis. It is not Church Mutual's burden to prove that "hail and wind was *not* the cause of the interior moisture at the Property"; Trinity must prove that it *was* the cause. ECF No. 33 at 13; *see also Nguyen v. Allstate Vehicle & Prop. Ins. Co.*, No. 2:24-CV-186-Z-BR, 2026 WL 497400, at *3 (N.D. Tex. Feb. 23, 2026) (Kacsmaryk, J.) (excluding *plaintiff's* expert testimony on the ground that it "fail[ed] to speak to whether the May 1 storm caused the damage that resulted

in a leak in Plaintiff's roof" and noting that "[i]t is Plaintiff's burden to establish this" (citing *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 400 (Tex. 2016) ("To prove coverage, the plaintiff must establish that . . . the injury or damage was incurred at a time covered by the policy."))).

However, because Church Mutual offers an alternative explanation through Cowen's expert testimony, Cowen also must account for potential *alternative* causes of the damage. He easily clears this hurdle. In the "Moisture Intrusion" section of his expert report, Cowen notes that he observed "[d]eteriorated sealant on the base flashing components along the roof to wall interface at the raised roof area," which he took to be likely entry routes for moisture. ECF No. 46-1 at 26. He attached more than a dozen photos of the Property to support this. *See id.* at 26–29. Crucially, he further opines that he also "observed an *absence* of any wind- or hail-created breaches through the roofing that would allow moisture intrusion." *Id.* at 29 (emphasis added). And he writes that the moisture intrusion observed was always "located near roof-wall interfaces" where improper repairs had been performed in the past. *Id.*

Thus, Cowen is not saying that the moisture intrusion could have been caused by improperly applied sealant *or* by hailstorm damage. He affirmatively opines that he did not observe any "wind- or hail-created breaches" that could have allowed moisture to enter, *and* that the moisture intrusion he found was located near "deteriorated sealant." *Id.* at 29. This is sufficient to qualify as relevant and reliable expert testimony. And there is no "great analytical gap" between his observations and his conclusions, as Trinity claims. ECF No. 33 at 14 (citation modified).

**2. Troy White**

Church Mutual retained "engineer Troy White" to "offer expert testimony regarding the physical condition of the Property, the nature and extent of any physical damage sustained to the Property, and the cause and origin of existing physical damage to the

Property." ECF No. 45 at 5. White's opinions are limited to "[i]dentify[ing] and document[ing] hail and/or wind damage present, if any, to the gravel surfaced asphalt built-up roof assembly" and "determin[ing], to the extent possible, the sources of moisture causing stains and damage to interior building components and finishes throughout." *Id.* (quoting ECF No. 45-3).

Trinity's Motion to Exclude focuses almost entirely on Cowen. Trinity contends that "[t]he only difference between Defendant's two expert witness opinions is that White offers an additional opinion as to the lab samples taken and reviewed, as well as additional analysis as to the cause of interior water damages at the Property." ECF No. 33 at 17. As discussed below, this is not an accurate description of Church Mutual's two expert reports. But even taking Trinity's objection at face value, Trinity fails to develop their argument further. *See id.* at 17–18. Everywhere Trinity objects to one of White's opinions, they argue that it should be excluded because it is duplicative of Cowen's. Thus, for one of White's opinions to be excluded, the Court must find that it "needlessly present[s] cumulative evidence" that Church Mutual could rely on Cowen alone to present. FED. R. EVID. 403.

That is Trinity's final argument, and it applies to both Cowen and White. Trinity argues that the two experts "cumulatively testify on the same topics and facts" and should both be excluded on that basis. ECF No. 33 at 16 ("Defendant designated two experts who together provide duplicative and repetitive information as to the same topics." (emphasis omitted)).

Yes, under FRE 403, experts should not "needlessly present[] cumulative evidence." FED. R. EVID. 403. But expert testimony should not be excluded simply because two different experts opine on the same topics. Further, Church Mutual identifies several ways in which Cowen's and White's opinions materially differ:

> (1) Cowen inspected the Property during the adjustment on October 5, 2023, while White inspected the Property in response to a pre-suit demand and anticipated litigation on February 5 and August 12, 2025; (2) Cowen's investigation occurred during the claim adjustment and involved evaluation of the entire Property; (3) Cowen has personal knowledge of specific claim events; and [(4)] White was retained specifically for litigation to provide expert opinions on causation, but the scope of White's testimony is limited to "[i]dentify[ing] and document[ing] hail and/or wind damage present, if any, to the [GBUR]" and "determin[ing], to the extent possible, the sources of moisture causing stains and damage to interior building components and finishes throughout.

ECF No. 45 at 15 (internal footnote omitted). Beyond one side-by-side comparison table highlighting comparisons between the two experts' expert designations, *see* ECF No. 33 at 16–17, Trinity does not meaningfully engage with Church Mutual's counterargument that Trinity "failed to make a showing as to why Cowen's and White's allegedly duplicative and needlessly cumulative testimony is outweighed by its prejudicial value pursuant to Rule 403." ECF No. 45 at 16. Both Cowen's and White's opinions are therefore admissible in their entirety over Trinity's objections.

*B. Church Mutual's Motion to Exclude*

Church Mutual moves to exclude the testimony of Trinity's two experts, Monty Stone and Chase Brewer. Both proffered experts' testimony solely concerns damages estimates to the Property. *See* ECF No. 48 at 5 (discussing Stone and Brewer's "respective damages estimates").

The parties agree that both Stone and Brewer used Xactimate, a damages-estimates software, to calculate the alleged repair costs to the Property. They also agree that "Xactimate is a *Daubert*-approved software system widely used in the insurance industry." ECF No. 53 at 1. However, Church Mutual contends that Stone and Brewer's proffered testimony should be excluded because each "manipulated" Xactimate to arrive at their preferred conclusions. ECF No. 53 at 3. Church Mutual argues that their expert testimony thus reflects an unreliable methodology should be excluded on that basis.

Church Mutual is correct that Stone and Brewer's calculations go far beyond simple differences of opinion. Church Mutual's Reply includes a nearly four-page-long list of bullet points that show the many ways Trinity's proffered experts "put a thumb on the Xactimate scale" in Trinity's favor. *See* ECF No. 53 at 3–6. Discussion of a few of these alleged manipulations will suffice to illustrate the point.

After wading through a sea of acronyms and technical terminology, it is clear that Stone:

> (1) Manipulated BUR replacement unit cost well above defaults: For the BUR cover, MESH used $979.24/SQ, which is 85.06% above the default 4-ply ($532.02/SQ) and 53.33% above the default 5-ply ($638.62/SQ) on TXAM8X_01JUN23.
>
> (2) Added extra BUR waste despite default waste in line item: MESH applied an additional 10% quantity factor on BUR even though the selected Xactimate line already includes a default 5% waste, compounding quantities beyond defaults.
>
> (3) Altered roof substrate composition without clear code methodology: MESH omitted the like-kind 1/2" fiberboard and added a 2" poly-iso board atop 3" poly-iso without providing the code-based thermal calculations or citations to justify the deviation from the existing assembly.
>
> (4) Selected higher hourly labor rates than defaults for activity/trade: By choosing RFG at $145.10/hr over RFG-M at $101.77/hr and DMO at $46.32/hr, MESH increased hourly labor inputs by 42.57% vs. RFG-M and 313.25% vs. DMO, respectively.

ECF No. 53 at 3–5.

And Brewer:

> (1) Adopted MESH-like labor rate substitutions in later estimate: Brewer's initial 8/10/2023 estimate priced the BUR at about $1,869.48/SQ (637.3 SQs yielding $1,191,418.87 for roofing within $1,322,532.88 RCV total); the later 9/5/2024 estimate shifted practices to use RFG in lieu of RFG-M and DMO, ballooning RCV for roofing alone to $2,831,426.24 and roughly $4,442.85/SQ—an increase of about 237.65% over its own prior BUR unit pricing.
>
> (2) BUR removal unit price above default removal rate: Brewer prices "Remove Built-up 4 ply roofing – in place" at $210.02/SQ, materially above the

default-published removal (–) unit cost for BUR of $88.60/SQ on TXAM8X_01JUN23 (default removal uses DMO labor).

(3) Added quantity/waste beyond default for BUR: The Brewer estimate shows BUR removal at 637.30 SQ and replacement at 701.03 SQ (≈10% increase), even though the BUR line item already includes default waste in Xactimate; adding manual waste on top of the default waste is a deviation from default-published assumptions.

(4) Percentage add-ons applied on top of inflated base (non-default practice): TPC applies "Incidentals" ($540,811.74), "Demand Surge" ($270,405.87), and then 20% OH/15% profit to the subtotal, mirroring the criticized MESH structure; Behrens flags such percentage add-ons (including 20/15 GC O&P) as unsupported and atypical relative to default-based estimating, and inconsistent with MESH's and Brewer's own 10/10 precedent.

ECF No. 53 at 5–6. These are just a few of Church Mutual's twenty-seven total examples.

Trinity offers no justification for Stone and Brewer's dozens of Xactimate alterations, and the Court finds that they reflect an unreliable methodology unfit for presentation to the jury as expert testimony. Stone and Brewer's damage-estimate opinions are thus excluded in their entirety.[2]

**II. Church Mutual's Motion for Partial Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, Church Mutual moves for summary judgment on the following claims asserted by Trinity: Breach of the duty of good faith and fair dealing, violations of Section 541 of the Texas Insurance Code, and violation of the Texas Deceptive Trade Practices-Consumer Act. ECF No. 34. Church Mutual also asserts that damages must be limited to $1,339,163.97. *Id.* Church Mutual does not seek summary judgment on two causes of action pled by Trinity: breach of contract and violation of the prompt payment of claims under the Texas Insurance Code. After reviewing the evidence and briefing, the Court **GRANTS** in part and **DENIES** in part Church Mutual's Motion for

[2] This is without prejudice to Trinity offering similar opinions at trial in the form of non-expert testimony.

Partial Summary Judgment. The Court addresses each issue below.

*A. Limiting Damages to $1,339,163.97*

Church Mutual seeks to limit Trinity's damages to $1,339,163.97, the amount initially estimated by Trinity's contractor, Chase Brewer, in September 2023. This estimate detailed costs for full replacement of the built-up roofing system on the Church, the shingle roof on the shed, metal awning and carport, sport court, fabric playground covers, and spot/painting repairs of the exterior of EIFS elevations. *Id.* Trinity argues that the $1,339,163.97 initially reported by Brewer was incomplete and that "[i]t was only after Brewer completed a full investigation of the Property that he was able to draft an estimate that included all of the additional damages he found in the subsequent inspections" and "correct mistakes in his initial 2023 draft estimate." ECF No. 51 at 9.

Even though the Court struck Chase Brewer and Monty Stone's Expert Reports, the Court finds there is a genuine dispute of material fact regarding damages. The determination of damages, as a factual question, is the prime responsibility of the jury. *See Hawkes v. Ayers*, 537 F.2d 836, 838 (5th Cir. 1976) ("[a] fundamental principle of American jurisprudence is that the fact-finder determines the quantum of damages in civil cases."). While damages were *initially* calculated by Brewer to be $1,339,163.97, Trinity contends that the investigation was incomplete and did not include several aspects of the Property that Trinity asserts were damaged by the June 2023 Storm. ECF No. 51 at 9. The extent and pricing of the damage resulting from the June 2023 Storm continues to remain uncertain. While Church Mutual concedes that the Property sustained "limited" damage from the hail (ECF No. 18 at 3), the extent and scope of the damage is unclear. Moreover, the wide disparity in the calculations of damage itself supports the conclusion that the sum can be assessed in vastly different ways. *Compare* Def.'s Appendix to Mot. for Summary Judgment, Ex. E, ECF No. 40-5 (Sedwick Estimate calculating damages at $9,085.39), *with* Def.'s Appendix to Mot. for

Summary Judgment, Ex. H, ECF No. 40-5 (Chase Brewer's August 10, 2023 Estimate calculating damages at $1,339,163.97), *with* Def.'s Appendix to Mot. for Summary Judgment, Ex. G, ECF No. 40-5 (Calvary Construction & Restoration's November 17, 2023 Estimate calculating damages at $98,683.01). The jury is the final arbiter of the proper calculation, with the freedom to compare all the competing evidence – not the Court.

The inquiry today is whether a reasonable jury may find a calculation to be higher than $1,339,163.97. While Trinity may fail to point to admissible evidence at this point showcasing a final sum calculated higher than that number, that does not necessarily mean that $1,339,163.97 is the legal ceiling for the jury to consider. A jury might, after a review of the damage, find the quantity to be higher. Accordingly, given the significant factual uncertainty, the Court finds that the assessment of damages must be left to the jury. The Court **DENIES** summary judgment as to this claim.

*B. The Duty of Good Faith and Fair Dealing and Texas Insurance Code Sections 541.060(a)(2), and (7)*

Next: the duty of good faith and fair dealing. Three of Trinity's causes of action will be addressed in this section: (1) The common law duty of good faith and fair dealing; (2) Texas Insurance Code Section 541.060(a)(2); and (3) Texas Insurance Code Section 541.060(a)(7). These sections of the Texas Insurance Code are understood "as codifications of an insurer's common law duties of good faith and fair dealing." *Platinum Trophy Hunts LLC v. Phila. Indem. Ins. Co.*, No. 1:22-CV-496, 2022 WL 17814614, at *4 (W.D. Tex. Dec. 19, 2022).

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) (citing *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). Trinity argues that Church Mutual breached the duty of good faith and fair dealing by:

(1) Making misrepresentations;

(2) Failing to properly investigate the roof damage;

(3) Failing to record the obvious evidence of covered damage across the entire roof despite admitting to hail damage to rooftop metal vents, rooftop HVACS, and the perimeter EIFS walls;

(4) Failing to properly investigate the interior damage and making arbitrary and capricious conclusions that the damage is historical and not the result of the recent hail, wind, and rainstorm despite offering no evidence in support;

(5) Mistrepresenting to Trinity that the interior damage was not due to rain and water entering the Property from a wind or hail created opening;

(6) Ignoring Defendant's own historical documents of the Property showing a lack of historical interior water damages;

(7) Issuing a decision letter on Trinity's Claim without knowing or even attempting to discover the full extent of hail damage to the roof system, or the cost of admitted to damages, and instead arbitrarily claiming the damages were below Trinity's deductible;

(8) Failing to timely evaluate the covered hail, wind, and rain damages in July when Defendant made its initial baseless decision to deny the Claim based on the damages being below Trinity's deductible simply to force Trinity to continue pursuing the Claim;

(9) Applying an arbitrary depreciation amount of damaged roof material that were not based on the age of the materials;

(10) Failing to write an estimate that included obvious covered damage from hail and wind to the roof and leaving out essential material required to properly repair and replace Trinity's Property; and

(11) Hiring Scout in an effort to solely limit Trinity's Claim despite, clear evidence of covered damage to the roofing system to the contrary.

ECF No. 16 at 18–19. Church Mutual responds to Trinity's arguments by asserting that Trinity has not met its burden of proving that the denial of the claim was unreasonable under the circumstances. ECF No. 35 at 16.

An insurer's duty of good faith and fair dealing is not breached "merely by erroneously denying a claim." *U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997). To sustain

a claim, "the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim." *Higginbotham*, 103 F.3d at 459. The insured must additionally prove that "there were no facts before the insurer which, if believed, would justify denial of the claim." *Id.* The focus of a bad faith inquiry is determined by "viewing the facts available to the insurer at the time of denial." *Hall Arts Off., LLC v. Hanover Ins. Co.*, 375 F.Supp.3d 979, 988 (N.D. Tex. 2018) (citing *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 49 (Tex. 1997)).

Importantly, bad faith is not established through evidence showing "the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy," *Allstate Vehicle & Prop. Ins. Co. v. Reininger*, No. 04-19-443-CV, 2021 WL 2445622, at *5 (Tex. App.–San Antonio, June 16, 2021, pet. denied), and "[m]ere negligence in the performance of contractual duties is not enough to prove bad faith." *Norberto v. State Farm Lloyds*, No. 5:19-CV-089, 2020 WL 8300518, at *2 (S.D. Tex. Nov. 25, 2020). Instead, bad faith requires evidence of "malicious or wrongful intent to defraud." *Irving v. Meridian Sec. Ins. Co.*, 649 F.Supp.3d 293 (N.D. Tex. 2022). The scope of an insurer's investigation varies with the claim's "nature and value and the complexity of the factual issues involved." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998). "If, after reasonable investigation, the insurer has evidence showing that the insured's claim may be invalid, a bad faith action is not viable." *Hall Arts Center*, 327 F.Supp.3d at 459 (citing *Tucker v. State Farm Fire & Cas. Co.*, 981 F.Supp.461, 465 (S.D. Tex. 1997)).

The Court finds that a reasonable jury could not conclude Trinity has met this high standard. Nothing in the evidence indicates Church Mutual knew or should have known there was no reasonable basis for denying payment of the claim. Trinity asserts Church

Mutual ignored the report provided by its initial adjuster, Charles Bankston, documenting "wind/hail damage to roof w[ith] interior leak" and that this is evidence of bad faith. ECF No. 51 at 14–15. Trinity further points to Bankston's "Preliminary Estimate" submitted alongside its initial report and asserts "[t]he reason the adjuster noted this was a preliminary estimate was because, while he acknowledge[d] clear liability for storm damaged items such as the sport court, interior leaks, and the modified-bitumen parapet walls on the roof, the adjuster also determined there was 'possible damage to the gravel ballast roof' and 'due to size/pricing of ballast roofing, we recommend engineering to inspect.'" From this, Trinity concludes Church Mutual "ignored its own adjuster's damages report." ECF No. 51 at 15.

None of these arguments present evidence of bad faith. First, neither of these arguments negate the fact that the Bankston provided a full report detailing its findings with an estimated amount at $9,085.39. When Church Mutual informed Trinity of the estimate, it was not "ignoring" the damages report but rather *following* the exact estimate identified as damage by the adjustor. Second, the adjuster clearly stated in the report that "[w]e were unable to see damages to gravel ballast roofing" and if there was any possible damage, it was "unknown." ECF No. 52-1 at 99–100. The report did not state unequivocally that there was likely damage to the gravel ballast roof—just the opposite. Following the initial estimate therefore was not unreasonable. There is no evidence of malicious or wrongful intent to defraud.

Trinity correctly notes that the initial report "recommend[ed] an engineer to inspect the roof of the church to determine if it sustained any damaged past cosmetic damage." ECF No. 52-1 at 99. But Trinity's argument merely shows that Church Mutual's investigation of the damage was incomplete—not that Church Mutual provided its report to Trinity in bad faith. The initial report only *recommends* retaining an engineer for further inspection. However, it was reasonable for Church Mutual to believe that such further investigation was

not necessary, especially because Bankston wrote that he was unable to see any damage to the gravel ballast roofing. ECF No. 52-1 at 99. Even if Church Mutual should have retained an engineer to further investigate the roof, the Court cannot discern "bad faith" under Texas law. In *Johnson v. State Farm Lloyds*, which Trinity cites, the Court found for the possibility of bad faith after an investigation *failed to even occur* at a property's electrical system despite evidence of damage there. No. 4:24-CV-3681, 2025 WL 3762136, at *5. That is much different from this case. Here, Church Mutual's initial adjuster, Charles Bankston, did in fact inspect the roof.

Moreover, no evidence suggests Church Mutual withheld material information and retained engineer Matthew Cowen at Scout Forensics under the pretext of reducing Trinity's damages amount. Church Mutual hired Matthew Cowen at Scout Forensics (and Frank Jones of Cavalry Construction) to further evaluate the claimed damage to the Property after Trinity submitted its own independent calculation of the damages countering Church Mutual's initial estimate. ECF No. 35 at 8. But Trinity has not provided any convincing support for the claim that Cowen was hired *to reduce* the amount of Trinity's recoverable damages. While there may not be any evidence of "historic and ongoing moisture" in Church Mutual's underwriting file, that does not preclude engineers at Scout Forensics like Cowen from identifying such damage later.

Trinity also argues that Church Mutual's adjuster, Sedgwick, initially wrote an estimate greater than $840,000 in property damages for the claim but never disclosed them (ECF No. 51 at 22; ECF No 52-1 at 183), but courts "look to the facts available to the insurer at the time of the denial when determining the reasonableness of the insurer's decision." *Alhamzawi v. GEICO Cas. Co.*, 216 F.Supp.3d 764, 768 (N.D. Tex. 2016) (citing *Viles v. Sec. Nat'l Ins. Co.*, 788 SW.2d 566, 577 (N.D. Tex. 1990)). Here, as Church Mutual notes, Sedgwick "neither provided the estimate to Church Mutual nor notified Church Mutual of the existence

of the estimate at any point during the adjustment of the Claim[.]" ECF No. 54 at 5. Church Mutual cannot act in "bad faith" when it doesn't know the data *exists*.

Trinity may have a plausible argument that damages ought to be higher than the amount Church Mutual initially stated at $9,085.39—as Church Mutual itself concedes in its Reply Brief. ECF No. 54 at 2. But that does not by itself constitute a *breach* of the duty of good faith and fair dealing. Thus, the Court agrees with Church Mutual that there is no genuine dispute of material fact that could lead a reasonable jury to find in favor of Trinity's arguments here. The Court **GRANTS** summary judgment as to this claim.

### *C. Violations of Chapter 541 of the Texas Insurance Code*

Church Mutual seeks summary judgment on Trinity's additional claims under Chapter 541 of the Texas Insurance Code. The Court will address these claims in two separate sections: The first pertains to the various arguments Trinity makes about an array of misrepresentations Church Mutual has made in violation of Texas Insurance Code Sections 541.051, 541.060(a)(1), 541.061. The second touches on the argument regarding Church Mutual's failure to provide Trinity a reasonable explanation of the basis in the policy for the insurer's denial of the Claim in violation of Section 541.060(a)(3).

#### 1. Misrepresentations of Coverage

Trinity argues that Church Mutual misrepresented its coverage policy to Trinity in violation of the Texas Insurance Code Sections 541.051, 541.060(a)(1), and 541.061. Specifically, Trinity argues that Church Mutual misrepresented:

(1) That Trinity was required to file any claim against Defendant in less time than what the Policy and Texas allows;

(2) That the roofing system at the Property was not damaged enough to meet the deductible;

(3) That Trinity could not make a claim for its buy back deductible until first resolving Trinity's Claim;

(4) That it could determine Trinity's Claim without knowing material facts such as the extent of the damages to the gravel built-up roof, or the costs of the admitted to damaged items;

(5) That repairing the roof would not require additional necessary materials and labor to properly complete repairs and return the Property to its pre-loss condition; and

(6) That no interior damage existed at the Property as the result of the hail, wind, and rainstorm.

ECF No. 16 at 12–13, 16.[3]

In response, Church Mutual avers that "misrepresentation" claims must show Church Mutual misled Trinity about its policy—not "factual disputes regarding the existence and scope of covered damages under the Policy." ECF No. 35 at 20.

Misrepresentations under Section 541 "only apply to misrepresentation about the terms and benefits of the policy itself—not the facts giving rise to a claim for coverage." *First Christian Church (Disciples of Christ) of Tyler v. Church Mutual Ins. Co.*, No. 6:23-CV-342, 2024 WL 3631080, at *6 (E.D. Tex. July 10, 2024); *see also Messersmith v. Nationwide Mut. Fire Ins. Co.*, 10 F. Supp. 3d 721, 724 (N.D. Tex. 2014) ("The misrepresentation must be about the details of the policy, not the facts giving rise to a claim for coverage."). More precisely, Texas Insurance Code's misrepresentation laws target false statements about what the policy *itself* provides, not false statements about the underlying event that allegedly triggers coverage. If an alleged misrepresentation is solely "related to the extent of damages, the cause of the damage, or repair costs," then such allegations are insufficient to sustain a claim for misrepresentations under the Texas Insurance Code. *Thornton v. State Farm Lloyds,* No. 23-CV-1476, 2024 WL 2588724, at *5 (W.D. Tex. Aug. 5, 2025).

True, misrepresentations under Section 541 refer to "misrepresenting a material fact or policy provision relating to coverage at issue" and "coverage" there refers to "the aggregate

[3] The claims alleged under Sections 541.051 and 541.061 are also included in allegations under Section 541.060(a)(1).

or sum of the risks covered by the policy," as Trinity points out. ECF No. 51 at 23 (citing *Johnson v. State Farm Lloyds*, No. 4:24-CV-3681, 2025 WL 3762136, at *5 (S.D. Tex. Dec. 11, 2025). But, the principle still stands: Allegedly false statements about *facts* giving rise to a claim cannot be challenged under Section 541. It merely describes the *scope* of the terms and benefits that a given policy promises to *cover*, which must themselves be the subject of the alleged misrepresentation.

All of Trinity's allegations under Section 541, with the exception of (1) and (3) above, involve Church Mutual making misrepresentations concerning the facts giving rise to whether coverage is itself available, *i.e.*, facts regarding the existence, cause, extent, and costs of the claimed damage, as opposed to misrepresentations about the terms or benefits of the policy itself. None purport to redefine the categories of risk that Church Mutual's policy insures against. For example, the determination of whether the roofing system was sufficiently damaged to meet the deductible involves *facts* regarding the magnitude of the claimed loss. Whether Church Mutual could have determined Trinity's claim without knowing certain material facts involve *facts* regarding the information necessary to evaluate the claimed loss. Whether repairing the roof would or would not require additional necessary materials and labor to properly complete repairs and return the Property to its pre-loss condition involve *facts* regarding the scope of repairs necessary to remedy the claimed loss. And, whether there was interior damage as a result of the June 2023 Storm involves *facts* about the existence and cause of the damage itself. None of these alleged misrepresentations are about the terms or benefits of the policy that Church Mutual provided to Trinity, but rather whether the underlying facts sufficiently satisfied the requirements of the policy. These are not the "misrepresentations" that Section 541 was intended to remedy.

Trinity's other misrepresentation claims, (1) and (3) above, also fail. First, while Church Mutual's adjuster may have mistakenly cited an inapplicable statute of limitations period under the Policy, Trinity clearly did not rely on such misrepresentation to its detriment as required by the law, *Partain v. Mid-Continents Specialty Ins. Services, Inc.*, 838 F.Supp.2d 547, 558 (S.D. Tex. 2012), since it filed this case well within the statute of limitation period anyway. Moreover, there is no evidence that Trinity suffered cognizable injury from the adjuster's representation, which Trinity must prove. *Id.* Second, with respect to misrepresentations regarding whether Trinity could make a claim for its buy back deductible before resolving Trinity's claim: No evidence supports this claim and Trinity points to no cognizable evidence in its briefing. The Court therefore **GRANTS** summary judgment as to these claims.

#### 2. Failure to Provide an Explanation of the Basis in the Policy for the Insurer's Denial of the Claim

Church Mutual next moves for summary judgment on Trinity's claim under Section 541.060(a)(3), that Church Mutual failed "to promptly provide Trinity a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of the Claim or offer a compromise settlement of a claim."

"An insurer violates Texas Insurance Code § 541.060(a)(3) when it fails to promptly provide to the policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim." *First Christian*, 2024 WL 3631080, at *7 (internal marks omitted). "The statute does not obligate an insurer to provide an insured every piece of information or every written document the insurer has regarding the offer or the investigation. Rather, the statute requires the insurer to provide a *reasonable explanation* of the factual or legal basis in the policy, in relation to the facts or applicable law." *Patton v. Meridian Sec. Ins. Co.*, 617

F. Supp.3d 516, 535 (N.D. Tex. July 2022).

Trinity avers Church Mutual failed to provide a reasonable explanation because it failed "to ever even determine the full amount of damages for Trinity's property that [Church Mutual's] own retained adjuster determined was covered under the Policy." ECF No. 51 at 26. Trinity notes that Church Mutual's adjuster submitted a "Preliminary Estimate" acknowledging liability for storm damaged items but that the estimate was incomplete and recommended engineer to complete a further investigation. *Id.* While the initial adjuster's report recommended further investigation, Church Mutual clearly communicated to Trinity that the expected cost of the damage was $9,085.39, well below the applicable deductible of $168,660. When the insurer provides estimates to the insured, such "estimates provide a reasonable explanation of the factual or legal basis in the policy, in relation to the facts or applicable law." *Patton*, 617 F. Supp. 3d at 536 (citation modified). Courts have granted summary judgment for claims under Section 541.060(a)(3) when the insurer makes clear that it "would not make any payment to [insured] because the damages sustained were less than [insured's] deductible in the policy." *Salinas v. State Farm Fire & Cas. Co.*, No. 10-194, 2012 WL 13055350, at *7 (S.D. Tex. Feb. 6, 2012). As Church Mutual correctly notes, its representatives regularly communicated its coverage determinations through emails and letters and provided Trinity with explanation for its coverage position that the covered hail damage to the Property fell below that applicable 2% wind and hail deductible. ECF No. 40-4 at 2–3. While Trinity may *disagree* with Church Mutual's conclusion, simply disagreeing with the insurer's reason is not sufficient to make out a claim under Section 541.060(a)(3). *See Abesu v. Allstate Vehicle and Prop. Ins. Co.*, No. 3:24-CV-3171, 2026 WL 1959123, at *4 (N.D. Tex. July 6, 2026).

Accordingly, the Court finds that Trinity has failed to state a claim under Section 541.060(a)(3) to which a reasonable jury could disagree. The Court **GRANTS** summary

judgment as to this claim.

*D. Violations of the Texas Deceptive Trade Practices-Consumer Act ("DTPA")*

Finally, Church Mutual seeks summary judgment on Trinity's cause of action under the DTPA. The DTPA provides Texas consumers with a cause of action for deceptive business practices, including violations of Chapter 541 of the Texas Insurance Code. TEX. BUS. & COMM. CODE § 17.50(a)(4). As pled by Trinity, a violation of the DTPA requires an underlying violation of the Insurance Code, and thus, "the DTPA claim will rise or fall based on the Insurance Code claims." *Univ. Baptist Church of Ft. Wor. v. York Risk Services Grp. Inc.*, 776 F. App'x 863, 864 (5th Cir. 2019); *see also Effinger v. Cambridge Integrated Services Grp.*, 478 F. App'x 804, 807 (5th Cir. 2011) (finding that when an injured employee's DTPA claim against an insurer was dependent on Texas Insurance Code claims, dismissal of those claims resulted in failure of the DTPA claim too). Here, because the Court finds Trinity has not adequately asserted violations under Section 541 that give rise to a genuine dispute of material fact, the Court finds too that Trinity has failed to make out a claim under the DTPA and **GRANTS** summary judgment as to this claim.

CONCLUSION

For the foregoing reasons, Trinity's Motion to Exclude (ECF No. 32) is **DENIED**, Church Mutual's Motion to Exclude (ECF No. 37) is **GRANTED**, and Church Mutual's Motion for Partial Summary Judgment (ECF No. 34) is **GRANTED** in part and **DENIED** in part. Claims of breach of the duty of good faith and fair dealing, violations of Section 541 of the Texas Insurance Code, and violations of the DTPA are **DISMISSED**. Claims of breach of contract and violations of the Texas Insurance Code regarding the prompt payment of claims remain pending.

**SO ORDERED.**

September 16, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE